IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. KELLOGG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JORDAN L. KELLOGG, APPELLANT.

Filed July 30, 2019.    No. A-18-542.

Appeal from the District Court for Douglas County: W. MARK ASHFORD, Judge. Affirmed.

Jim K. McGough, of McGough Law P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

Jordan L. Kellogg appeals from his plea-based convictions in the Douglas County District Court for four counts of robbery. He was sentenced to consecutive terms of 6 to 10 years' imprisonment on each count. On appeal, Kellogg claims the district court erred in denying him probation and in failing to order a competency evaluation after learning of his mental health diagnoses. Kellogg also claims his trial counsel was ineffective. We affirm.

## BACKGROUND

In November 2017, the State filed an information charging Kellogg with seven counts of robbery (Counts 1 through 4 alleged to have happened on or about September 19, 20, 22, and 23, respectively; Counts 5 through 7 alleged to have happened on or about September 26, 27, and 28, respectively) and one count of attempted robbery (Count 8 alleged to have happened on or about September 23). Each count identified different victims. Thereafter, the district court entered an

- 1 -

order in which it appointed the public defender's office to represent Kellogg and accepted Kellogg's plea of not guilty.

At a hearing in March 2018, Kellogg's counsel informed the district court that Kellogg was going to withdraw his plea of not guilty and enter a plea of no contest to Counts 1 through 4, expecting the State would dismiss Counts 5 through 8 in exchange. Kellogg entered pleas of no contest to Counts 1 through 4 of the information. The State gave the following factual basis for those counts:

[W]ith regards to Count 1[,] . . . on . . . September 19th, 2017, officers were called out to . . . 24th and Redick Street . . . in Omaha, Douglas County. They met with [B.W.], who advised he had messaged an individual on PlentyOfFish.com [a dating website], assumed he was meeting up with a female at this location. Upon arrival, three black males, as he described, approached him, approached his vehicle. One of them brandished a handgun, tapped on the window and demanded his keys, his wallet and his iPhone. He then exited the vehicle.

They went through the vehicle, threw his keys, and then told him he could go back to his car. They then fled the area. His phone was later recovered from an ecoATM . . . .

With regards to Count 2 . . . on September 20th of 2017, officers were again called to a robbery that occurred in the area of 24th and Redick Street. [A.B.] advised that he had set up to meet an individual on PlentyOfFish.com. He was approached by a black male with a semiautomatic handgun and demanded that he give his cellphone, cash, and any other valuables. His cellphone was also recovered from this ecoATM . . . .

With regard to Count 3, on September 22nd of 2017, officers were called to [an address on] State Street, also in Omaha, Douglas County, met with . . . [A.R.], who advised he had come to this location to meet an individual he had met on PlentyOfFish.com. He was approached by two black males, one was armed with a semiautomatic, and told to empty his pockets and to place wallet and cellphone on the ground. They then left, at which point [A.R.] called officers. His phone was also recovered from this ecoATM . . . .

With regards to Count 4 . . . on September 23rd of 2017, officers were called to [an address on] North 24th Street. At that location they met with [T.D.], who advised he had set up to a meet a female on PlentyOfFish.com. When [T.D.] arrived in the area, he was approached by three black males. One tapped on his window with a handgun. [T.D.'s] . . . iPhone and wallet and a silver chain that he was wearing around his neck were taken from his person. His necklace as well as his iPhone were recovered.

. . . [T]here were credit cards that were taken. Through those credit cards there were purchases made [that] linked back to [Kellogg] and his email address. [Investigating officers] saw that [Kellogg] . . . sold all these phones to the ecoATM.

[Kellogg] was arrested and gave officers statements implicating himself in these robberies.

The district court asked what Kellogg's role was in the robberies, and the State said Kellogg acknowledged to being "the person with the gun in two of them -- three of them." The State provided that the victims would testify that the individual who held the firearm would "start" and

there would be another person who would approach the other side of the vehicle demanding and taking the property as the other individual held the firearm.

Kellogg did not object to the State's alleged facts and did not wish to add additional facts. The district court found that the State's factual basis for Counts 1 through 4 was sufficient and supported those counts beyond a reasonable doubt and that Kellogg knowingly, understandingly, intelligently, and voluntarily entered pleas to those counts. Accordingly, the district court found Kellogg guilty of robbery on Counts 1 through 4. Thereafter, the State moved to dismiss Counts 5 through 8 of the information.

Following a sentencing hearing in May 2018, the district court sentenced Kellogg to 6 to 10 years' imprisonment on each count of robbery (Counts 1 through 4), to be served consecutively, with credit for 227 days' time served.

Kellogg appeals.

## ASSIGNMENTS OF ERROR

Kellogg claims, restated, that (1) the district court abused its discretion by not ordering probation, (2) the district court failed to conduct a competency hearing, and (3) he received ineffective assistance of trial counsel.

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018).

The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id*.

## ANALYSIS

### IMPRISONMENT INSTEAD OF PROBATION

Kellogg was convicted of four counts of robbery pursuant to Neb. Rev. Stat. § 28-324(1) (Reissue 2016), all of which are Class II felonies under § 28-324(2). A Class II felony is punishable by 1 to 50 years' imprisonment. See Neb. Rev. Stat. § 28-105(1) (Supp. 2017). Kellogg was sentenced to 6 to 10 years' imprisonment on each of his four convictions, to run consecutively. His sentences were within the statutory range.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy, supra*. In determining a sentence to be imposed, relevant

factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.* Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *Id.*

The presentence investigation report (PSR) shows Kellogg was 20 years old at the time of his sentencing. He has one dependent child. His criminal history includes juvenile offenses for criminal mischief and gun possession/transfer; as an adult, he has convictions for possession of "K2" or marijuana (2016, fine); two counts of carrying a concealed weapon (May 2017, 30 days in jail; June 2017, 120 days in jail); and possession of marijuana (2017, fine).

Kellogg reportedly accepted responsibility for the current offenses, but appeared to rationalize his actions by attributing them to negative influences from procriminal peers. Kellogg "cut ties" with all previous companions due to their involvement with procriminal activity, including his codefendant in the present offenses. The PSR found it likely that Kellogg had an active gang affiliation because of a "Facebook photo" of the codefendant holding up a known gang hand sign, Kellogg's brother's involvement in a gang, and Kellogg's own "Facebook post" referring to a specific gang. The PSR concluded from Kellogg's actions and rationalizations in the current matter that he may possess decision-making and problem-solving deficits. According to Kellogg, he had been diagnosed with "Bipolar, Anxiety, and Depression" and was currently taking two kinds of medications for those concerns. Kellogg's score on a mental health assessment tool indicated he may benefit from additional mental health services.

On the level of service/case management inventory, Kellogg scored overall in the high risk range to recidivate. Individual scores reflected: very high risk/need in areas of antisocial pattern and companions; high risk/need in the area of leisure/recreation; medium risk/need in areas of criminal history, family/marital, and alcohol/drug problem; and low risk/need in areas of education/employment and procriminal attitude/orientation. The PSR recommended a term of probation with a specialized gang officer, explaining: "[Kellogg] could greatly benefit from the assistance provided by probation in order to establish a positive support system, maintain assistance necessary with mental health and substance abuse concerns, and learn appropriate decision making skills."

At the sentencing hearing, Kellogg's counsel expressed that the PSR "fairly" pointed out some benefits Kellogg could receive from probation. Defense counsel noted that Kellogg came from a family that has mental illness, and that Kellogg was now taking medication which controlled "a lot of the impulses and mania behaviors." Kellogg had achieved "good things" when on his medication, such as receiving an associate's degree and employment, and was "mortified" by the incidents underlying his convictions. Kellogg's counsel disputed that Kellogg was in a gang. Counsel stated that Kellogg was looking forward to working with his therapist and psychiatrist again, being employed and a productive member of society, and putting "this" behind him. Kellogg personally said the "whole situation" had been "like a turnaround" in making him value life and

realize what he would do to better himself and "everybody" if given the chance to "get out into society." He was "not a person to go out and rob people." He said he hung around gang members because that was who he grew up around.

The State pointed out the two victim statements in the PSR. In his letter dated April 21, 2018, victim B.W. said he was "robbed at gunpoint" so he was "pretty shaken up about it still," and would "always remember it." The State thought it would be a "different scenario" if it was "one robbery and one isolated incident," but argued that there were "eight separate armed robberies of numerous individuals who thought that they were meeting up with a female party that had been speaking with them on a dating app." "These robberies were planned out in advance. These were not spur of the moment." The State also said that it was "very concerning" that Kellogg just had a weapons charge from an arrest in March 2017 "that was reduced to concealed weapon [for] which he got 120 days in June" and shortly after that these incidents took place. The State argued that probation was inappropriate because of Kellogg's use of a weapon (during commission of the instant offenses) and Kellogg's history of weapon charges. It thought that probation would depreciate the seriousness of the conduct and promote disrespect for the law.

The district court commented on how it did not hear Kellogg express concern about the victims. It talked about the potential psychological impact of violent crimes, such as the instant case, upon victims. "It's something that these people will never forget. It's a form of trauma that's extensive." The district court appreciated that Kellogg wanted to support his child, but told him, "maybe you should have thought about that before you committed these crimes." It noted that property was not recovered for many of the victims. It referred to Kellogg's two past weapons charges and opined that Kellogg was "a dangerous young man." The district court was "shocked" by the PSR's suggestion of probation.

Kellogg argues on appeal that the district court erred "by not first considering probation" before imposing prison sentences. Reply brief for appellant at 6. He contends that "[s]entencing courts must first consider and eliminate probation as an option before sentencing an offender to jail." Brief for appellant at 18. He asserts the district court failed to accord due consideration of the conditions set forth in Neb. Rev. Stat. § 29-2260 (Reissue 2016) or the PSR's findings, and that the court failed to explain on the record its reasoning for the sentences imposed. He requests that his sentences be reduced to a term of probation by this court pursuant to statute or that the case be remanded for a sentencing hearing to include "meaningful" consideration of required conditions. Brief for appellant at 23.

Section 29-2260(2) provides that when a court considers the sentence for an offender convicted of, as relevant here, a felony for which mandatory or mandatory minimum imprisonment is not specifically required, a court "may withhold sentence of imprisonment" unless, having regard to the nature and circumstances of the crime and the history, character, and condition of the offender, the court finds that imprisonment of the offender is necessary for protection of the public because: the risk is substantial the offender is likely to engage in additional criminal conduct, the offender needs correctional treatment that can be most effectively provided by commitment to a correctional facility, or a lesser sentence will depreciate the seriousness of the crime or promote disrespect for the law. See, also, § 29-2260(3) (factors, while not controlling discretion of court, weighing in favor of probation). The language in § 29-2260(2) which provides that the court "may

withhold sentence of imprisonment" is merely a guideline and does not mandate a sentence of probation. *State v. Thornton*, 225 Neb. 875, 408 N.W.2d 327 (1987).

Whether the sentence imposed is probation or incarceration is a matter within the discretion of the trial court, whose judgment denying probation will be upheld in the absence of an abuse of discretion. *State v. Crowdell*, 241 Neb. 216, 487 N.W.2d 273 (1992). The record reflects the district court reviewed the PSR; among other commentary, its expression of shock to the PSR's recommendation of probation is indicative of that review. The record refutes that the district court relied on any inappropriate considerations in sentencing Kellogg.

While a sentencing court is not required to make specific factual findings to justify the sentence imposed, the district court stated some of its findings during the sentencing hearing. See *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017). The court's statements, noted above, addressed Kellogg's criminal history, the nature of his offenses, the amount of violence involved in the commission of his crimes, and Kellogg's character; these were appropriate considerations which supported imposing imprisonment over probation. See, *State v. Leahy*, 301 Neb. 228, 917 N.W.2d 895 (2018) (factors customarily considered in sentencing); § 29-2260(2) (factors weighing in favor of imprisonment include substantial risk offender likely to engage in more criminal conduct and lesser sentence would depreciate seriousness of crime or promote disrespect for law). Kellogg's crimes were serious and were inflicted upon numerous different unsuspecting victims over a relatively short timeframe. He was found to be a high risk to reoffend, and as noted by the State, perhaps it would have been a "different scenario" if it was "one robbery and one isolated incident," rather than repeated acts of armed robbery. Further, the armed robberies took place in September 2017; this immediately followed Kellogg's June sentence of 120 days in jail for a concealed weapon charge. Despite having just served jail time for a weapon-related offense, Kellogg proceeded to engage in numerous armed robberies. Six to 10 years is in the lower end of the sentencing range of 1 to 50 years' imprisonment for a Class II felony, and although the four sentences were ordered to run consecutively, a combined sentence of 24 to 40 years' imprisonment for four different instances involving victims being subjected to armed robbery is not an abuse of discretion.

COMPETENCY HEARING

Kellogg claims the district court erred by not conducting a competency hearing after learning about his "numerous mental illnesses." Brief for appellant at 28.

Neb. Rev. Stat. § 29-1823 (Supp. 2017) states, in part: "If at any time prior to trial it appears that the accused has become mentally incompetent to stand trial, such disability may be called to the attention of the district [court] by the county attorney . . . by the accused, or by any person for the accused." A trial court can determine a defendant's competency at any time, including after trial but prior to final judgment, and that is the obligation of the court to do so. See *State v. Martinez*, 295 Neb. 1, 886 N.W.2d 256 (2016). However, a court is not required to make a competency determination in every case in which a defendant seeks to plead guilty; a competency determination is necessary only when a court has reason to doubt the defendant's competence. See *State v. Hessler*, 295 Neb. 70, 886 N.W.2d 280 (2016).

A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The question of competency to stand trial is one of fact to be determined by the court, and the means employed in resolving the question are discretionary with the court. *Id.*

We note the following colloquy from the March 2018 plea hearing:

THE COURT: Do you suffer from any mental illnesses that you're aware of?

[Kellogg]: Like ADHD, depression, bipolar disorder, ADD.

THE COURT: Are you taking any medication for those problems?

[Kellogg]: Yes, [two different medications listed].

THE COURT: Anyway, the medications you're taking, do they interfere with your ability to understand what you're doing today?

[Kellogg]: No, sir.

Kellogg concedes the district court asked whether his medications impacted his ability to understand the proceedings that day, but argues that the court failed to inquire any further about his mental illnesses. He points out information related to his mental health set forth in the PSR as well as his counsel's arguments during the sentencing hearing (most of which we noted previously) showed there was "more than a single sufficient doubt regarding his competency." Brief for appellant at 29. He argues the court should have ordered and conducted a competency hearing because the record "unequivocally" showed his counsel, the probation office, and the court had sufficient notice that Kellogg suffered from mental illness and came from a family with a history of mental illnesses. Reply brief for appellant at 5.

However, a defendant's derangement or lack of mental ability is not sufficient to prove incompetence to stand trial. See *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016). Stated another way, just because Kellogg reported having mental health diagnoses and the PSR noted his report of the same does not necessarily mean he was incompetent to plead or stand for his sentencing. The PSR indicated that Kellogg said he had been "mentally diagnosed with Bipolar, Anxiety, and Depression," and was "taking [specified medications] to assist in such concerns," but that he had not been placed in emergency protective custody, had not been hospitalized for any previous significant concerns, and Kellogg "cited no current or prior suicidal thoughts or ideations." A "Mental Health Screening Form III (MHSF-III)" identifies possible mental health problems that may require further assessment and treatment. Kellogg scored "an 8 on the MHSF-III, indicating [he] may benefit from additional mental health services." However, there was no indication that Kellogg was unable to understand questions being asked of him; in fact, Kellogg spoke specifically about furthering his education, "cited prison time as his motivation" to abstain from procriminal behavior, and "presented in the contemplative stage of change." There is nothing in the record to suggest Kellogg demonstrated any signs of mental incompetence during these proceedings.

Further, Kellogg's argument that the district court did not determine whether he understood the nature of the charge against him or the possible sentences is refuted by the record. At the March

2018 plea hearing, the court asked Kellogg about his education, to which Kellogg responded that he had 2 years of college. And the record shows Kellogg understood his condition in reference to the proceedings and had the capacity to make a rational defense. The following colloquy took place during the March 2018 plea hearing:

> THE COURT: . . . each count of robbery is a Class II felony. It does carry a penalty of anywhere from one to 50 years in [prison] . . . I have no idea what the penalty would be but I'm just going over the possibilities here, if you are sentenced on all four of these counts, assuming I accept your plea, I could order you to serve some time. I could have you serve time what we call concurrently. That would be if I ordered time to be served on each count the time would run together. Do you understand that?
>
> [Kellogg]: Yes, sir.
>
> THE COURT: . . . Or I could conceivably order time to be served consecutively. In other words, you'd have to serve time on one count and finish that before you start another count and so on. Do you understand that?
>
> [Kellogg]: Yes, sir.
>
> THE COURT: Do you understand the difference?
>
> [Kellogg]: Yes, sir.

The court proceeded to read each count, informing Kellogg of the elements of robbery in each instance. Kellogg then entered his pleas. Kellogg confirmed his understanding of what pleading no contest meant in general and in the context of sentencing. The district court explained to Kellogg all the rights he was waiving by entering his pleas, to which Kellogg repeatedly confirmed his understanding.

The district court asked if Kellogg understood the benefit he was receiving due to his attorney working with the county attorney in obtaining the resolution (plea deal); Kellogg acknowledged he understood. When asked, Kellogg confirmed that he was not promised anything, was not told what kind of sentence he would receive, and had not been threatened or coerced by anyone in any way. Kellogg also confirmed that he had time to talk the matter over with his counsel and had told her everything he felt she needed to know about what happened on the days of the incidents. The court stated, "In fact, she's successful in having four counts dismissed. Would you agree she's done a good job in representing you?" Kellogg answered, "Yes, sir." After the State provided its factual basis, the district court asked Kellogg whether he had "any questions about anything that's taken place since [his] arrest or up through this moment"; Kellogg responded, "No, Your Honor."

During the sentencing hearing in May 2018, neither Kellogg's counsel, Kellogg himself, the State, nor the district court questioned Kellogg's mental health as he presented himself for that hearing. Aside from defense counsel's argument referencing information in the PSR, there was no argument or finding regarding Kellogg's mental health. In fact, defense counsel noted that when Kellogg "is on his medication, [he] has achieved good things," and counsel further pointed out that Kellogg had an associate's degree. Kellogg personally stated that "this whole situation has been like a turnaround. It's been making me value my life and realize what I want to do in my life." He explained that although he "hung around gang members," he did not "gang bang." He said he had

not seen "a jail cell" until he returned from college, and that when he "was in school and around positive people," he "had no trouble at all."

Based upon our review of the record, we are unable to find anything that would have reasonably raised concerns about Kellogg's competency during the plea or sentencing hearings. While Kellogg complains that the district court's actions at the March 2018 plea hearing were the "bare minimum" to determine if he truly was competent to proceed, brief for appellant at 29, our review of the record shows sufficient evidence to dispel any doubt of Kellogg's competency during the proceedings. The record supports that Kellogg was competent to plead and stand for sentencing in accordance with capacity requirements set forth in *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

## INEFFECTIVE ASSISTANCE OF COUNSEL

Kellogg claims he received ineffective assistance of trial counsel. He has different counsel than his trial counsel for this direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record in order to preserve such claim. *State v. Spang*, 302 Neb. 285, 923 N.W.2d 59 (2019). Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id*. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. See *id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant has the burden to show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Spang, supra*. In a plea context, deficiency depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. *State v. Haynes*, 299 Neb. 249, 908 N.W.2d 40 (2018). The prejudice requirement in a plea context is satisfied if the defendant shows a "reasonable probability" that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty. *Id*.

Kellogg asserts his trial counsel was ineffective in (1) failing to request a competency evaluation despite "overwhelming indications that he suffered from mental illnesses" that "should have provided all parties with notice that there was sufficient doubt about [his] competence," (2) failing to have him evaluated to determine whether he was competent to enter a plea and be sentenced, (3) failing to adequately discuss with him the need for a competency review, and (4) failing to ensure the court received and reviewed Kellogg's "letter of allocution cited in the record and referenced in the [PSR]." Brief for appellant at 30-31.

Because they are closely related, we jointly discuss Kellogg's first three claims concerning the alleged necessity of a competency evaluation. To demonstrate prejudice from his trial counsel's alleged failure to investigate competency and seek a competency hearing, Kellogg would have to demonstrate that there is a reasonable probability that he was, in fact, incompetent and that the trial court would have found him incompetent had a competency hearing been conducted. See *State v. Hessler*, 295 Neb. 70, 886 N.W.2d 280 (2016). As we have already discussed, the record

refutes such a reasonable probability. The record does not show any basis to doubt Kellogg's competency during the proceedings, and in fact, the record demonstrates that Kellogg fully understood the nature and object of the proceedings against him, comprehended his own condition in reference to the proceedings, and had the capacity to make a rational defense. See *State v. Garcia, supra*. Trial counsel was not ineffective for failing to raise competence as an issue. See *State v. Williams*, 295 Neb. 575, 889 N.W.2d 99 (2017) (as matter of law, counsel cannot be ineffective for failing to raise meritless argument).

Kellogg also claims his counsel was ineffective for failing to ensure that the district court received and reviewed his "letter of allocution." Brief for appellant at 31. The PSR said Kellogg was given the opportunity to submit a written statement to the court for purposes of his presentence investigation. Attached to the PSR, as indicated, was Kellogg's statement given to the probation officer which said, "Me & my attorney are going to write a sep[a]rate statement"; it was signed with Kellogg's name and dated April 20, 2018. Having reviewed the entire PSR, there is no other attachment of a separate letter from Kellogg addressed to the court. The PSR says it was submitted May 14. During the sentencing hearing on May 21, when the court said it did not hear Kellogg state any concern about the victims, Kellogg's counsel stated, "he did offer a letter -- "; but the district court interrupted, saying it was "talking about what [Kellogg] just said [during the hearing]." It is unclear whether that letter was the same as what Kellogg intended to provide to the court, as stated in the PSR.

Kellogg asserts that his letter "could have addressed the court's concerns and echoed the full responsibility that the [PSR] noted that [he] had taken for his actions." Brief for appellant at 31. He believes that without ensuring the court received or reviewed his letter, it is "impossible" to know its impact, if any. *Id.* Kellogg does not specify in what way the letter would have informed the court beyond the contents of the PSR, his defense counsel's arguments, and his own allocution at the sentencing hearing. And since it was Kellogg's own letter, he should be able to articulate more specifics as to its contents than speculating that it "could have addressed the court's concerns." *Id.* Assuming the letter existed, if it merely stated he took full responsibility for his actions, then that would have been cumulative to the notations made in the PSR and defense counsel's statement during the sentencing hearing that Kellogg had "taken full responsibility for his actions." Kellogg does not allege that his letter differed substantially (or at all) from what he or his attorney personally expressed to the district court during sentencing.

An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). Kellogg's claim regarding his letter fails as it lacks particularity and is insufficiently alleged.

CONCLUSION

For the foregoing reasons, we affirm Kellogg's convictions and sentences, and find no merit to his claims of ineffective assistance of trial counsel.

AFFIRMED.